Good morning. I'm John Strain. I'm here representing the appellants in this case. These are combined actions, two cases, brought under ERISA for declaratory relief and to enforce the rights of plan participants to accrued benefits under a defined benefit pension plan maintained by Xerox Corporation. A good point to start is to recognize that the key term accrued benefit is defined specifically in ERISA and that's what we're talking about here is there are accrued benefits. The accrued benefit is a right to a retirement annuity commencing at normal retirement age in a dollar amount defined in the plan. The fact that it is defined is also critical. In this case, the specific defined benefit that we're seeking to recover or to enforce is defined in the plan as an amount equal to the participant's final average compensation multiplied by 1.4% and then multiplied by the number of years of service that these participants had earned under the plan. Because each of these participants had two separate periods of service, both periods of service need to be recognized in that formula since Xerox had not included in the plan something called a buyback rule. Both sides in this case rely heavily on the Seventh Circuit decision in Berger v. Xerox which involved the same plan but a different feature of the plan. It's important to understand that case even though it did involve a different feature, so let me start by talking about that for just a minute. Well, before you get there, you gave that formula, but aren't you going to have to subtract what he did get earlier? Well, yes, and that will be a key issue here. The participants are entitled to the accrued benefit as defined in that formula. The question is what is the effect of having received some kind of a payment before, okay? And the effect of that should be that that either does or does not satisfy some portion of that accrued benefit. So the question of subtracting it, our assertion is you subtract it in the sense that if it satisfied some of the accrued benefit, then you can subtract the portion of the accrued benefit that it did satisfy. Well, do you have any doubt that it did satisfy some of it? Well, I have a little doubt. It certainly did satisfy some of it, yes. And in that sense, I don't have any doubt that something was satisfied. There is some question only in the sense that there is a statutorily prescribed procedure for how you deal with two periods of service. But I thought there was an argument as to how you computed the value of what he got, but there would be no doubt that whatever that value was, it would be subtracted. It should be subtracted unless Xerox forfeited that right because they failed to include the buyback provision, which was a congressional amendment. Are you arguing that's the case? I'm sorry? Are you arguing that that is the case? Well, that's not our principal argument. Isn't your argument at all? Well, I think there is a potential, yes, that by failing to include that, that there shouldn't be any offset at all. But having said that, no, I'm not really pushing that argument. Yeah, it's a tough argument. So we're really arguing how you value what he got back in 1988 today. How dare you value what he got in 88? OK, well, I think the question, the answer to that is pretty simple. You look back in 1988 and you look to see what the accrued benefit, the defined concept was that he had earned at that point. At that point, when Xerox laid him off or send him off to Laurel in a spinoff, Xerox cashed him out. They said, you've got your accrued benefit. We're going to pay your accrued benefit. And because the what Xerox speaks of is accrued benefits and vested rights to accrued benefits. What was satisfied was the accrued benefit he had earned at that point in time. That that's the offset. It's not a matter of looking at a pool of money and seeing what happened with that pool of money. It's a matter of whether there was a substitute paid in lieu of the defined accrued benefit or not. And that concept, if you look at the burger case again, I started to say the burger case had two aspects. It had an aspect of determining what the accrued benefit was, which had a projection feature in it and which is not relevant to this case. And then it had another aspect, which is if you have an accrued benefit, how do you determine the substitute that satisfies that on that? The burger case said, quoting Arisa, requires that any lump sum substitute for an accrued benefit be the actuarial equivalent of that benefit. So when you're looking between a monthly annuity at retirement age and an earlier lump sum distribution, those are related to each other. Those are the equivalence between those two is determined actuarially. And those actuarial factors don't change whether you're looking in 1988 to see if $50,000 is equal to $1,000 per month accrued benefit, or whether you're now looking to see whether a prior $50,000 payment is equal to $1,000 accrued benefit now or something more. Well, what do you look to? I'm sorry? What do you look to? For actuarial equivalence? Yes. You look to factors that are specified pursuant to the statute. Section 205G3 of Arisa says that the relationship between an annuity payment and a lump sum distribution must be determined by actuarial factors. Prior to 1990 or something like that, those factors pursuant to the statute were published by the Pension Benefit Guarantee Corporation. Subsequent to that, because of statutory amendments, they're published by the Treasury Department based on Treasury bills. The statute really doesn't address this particular situation, though, does it? I'm sorry? The statute really doesn't address this particular situation directly. Well, it does in two senses. First of all, the statute defines accrued benefit. Right. Which is what you're entitled to. It's what the participant is vested in. And it defines what an appropriate substitute is for that accrued benefit. And it defines that in terms of actuarial equivalence. So when they left in 1988 or if they leave now, yes, the statute defines exactly how to compute the lump sum. Turning the other way. That's where you have the gap. Because the statute is talking about actuarial equivalence, it means this annuity, this accrued benefit is equivalent to the money that you got. And yes, I think that does address the issue, that the money you got is therefore equivalent to the accrued benefit you had earned at that time. And the statute doesn't say, oh, but if you don't want to look at it in that simple way, you can do some kind of other projection in terms of a fund or something like that. No, the statute doesn't say you can do that. And I think I think that's a main part of our argument is you follow the statutory approach, which is actuarial equivalence. You don't have some other kind of projection. Now, the statute does have a projection feature in it, which is the buyback rule. The buyback rule is Congress's statement in this detailed statute about what you do on two payment situations. Congress's statement is that if you want to take into account the payment you made on the first period that was made at the end, the lump sum at the end of the first period of service, here's how you do it. You put a provision in the plan saying the participant can pay back in, can come back in the plan and repay the money he was distributed. Plus an additional amount and the additional amount under Section 204 E of ERISA under the buyback rule that the participant pays back in is an interest factor, an interest factor defined pursuant to that buyback rule, Section 204 E. The buyback rule does not say, hey, if you do it the way we want you to do it, you can look at what your fund would have earned and you can require the participant to make Xerox whole for the fact it was making a lot of money on his investments. When Congress looked at the specific issue and showed how they thought it was done, they looked at an interest factor, a prescribed interest factor. So in that sense, I think the statute really does speak to the issue. Now, I'm not saying they had to have a buyback rule, but if they don't put the buyback rule, I'm saying the statute certainly suggests, if not compels, that they use an actuarial factor. Just one other comment on this first issue and then I'll move on to the other issue. The first thing I was going to say about the Berger case, the Berger decision dealt with a cash balance retirement account feature, which is a notional account balance. But it was a defined benefit feature. And therefore, the first thing the court in Berger had to do was to figure out what was the accrued benefit. To get to that accrued benefit, they took the notional account and they projected the notional account forward at the rate, the defined rate defined in the plan. They didn't project it forward based upon some kind of actual earnings rates. They were looking at the definition in the plan. So when the district court relied on Berger and said that the phantom account here that looks at the actual investment returns of the trust fund is exactly what was done in Berger, that's simply wrong. That's not at all what was done in Berger. Berger was looking at definitions in the plan itself to get to the accrued benefit and not at the issue we're dealing with here, which is whether the accrued benefit is satisfied. I'll move on to the second issue unless you have more questions on that one. Okay. The second issue is an issue that has seen a lot of litigation around the country in the last couple of years. There are several cases that I'll mention in my comments here that were decided after the date that this case was argued at the trial court. This relates to ERISA mandated disclosure documents, principally the summary plan description, but also as noted in the layout case, the summary plan description is really supplemented by the annual benefit statements. It's acknowledged that prior to about 1996, Xerox did an inadequate job in drafting these disclosure documents that were delivered to the participants. The summary plan description, as supplemented by the value added statement, did effectively say to the participants that they were accruing a substantial gross benefit. What it did not do is to inform them that that substantial benefit they were being promised would be offset by this disproportionate fandom account approach. The question is, what is the effect of their having done an inadequate job? That's the question that was remanded in the Second Circuit by the layout case a few years ago. The district court's conclusion on that applies the wrong legal standard. The district court concluded in order to recover for an inadequate SPD, the plaintiffs must show that they were actually injured. And we submit there is no requirement under proper legal standards to show actual injury from a defective summary plan description. Let me back up for a second. What is the function of the summary plan description? The courts have recognized that it is the primary source of information that the participant receives about his plan. And the summary plan description under the statutory terms must be written in a manner calculated to be understood by the average participant. So I ask, understood as what? When the employee at Xerox reads the material submitted to him and then comes to work, he's coming to work with the understanding that this these materials describe a significant portion of his terms and conditions of employment at Xerox. In classical contract law, what is that? That's a unilateral contract. It's an offer by one party, the employer, that is accepted by the other party, the employee, by his performance, by coming to work. And that, we submit, is the best way to analyze this question. If you look at Pfeiffer v. Prudential, cited in our brief, it's a Second Circuit case from 2002. That describes unilateral contract as an appropriate way to analyze a risk case. That happened to be a welfare benefit case, and therefore it's a little bit different, but it does talk about that unilateral contract concept. Again, since the trial court argument on this case, there have been several significant decisions. One of those is the Burstein decision in the Third Circuit, which clearly states that the appropriate standard is a standard of contract, that you have the plan text and you've got the summary plan description. Those are alternative statements of a contract. The participant is simply entitled to the better of the two. As a contractual matter, there's no requirement to show detrimental reliance. There's no requirement to show prejudice. A similar analysis has been applied by this circuit, the Ninth Circuit, in the Burt case, B-E-R-G-T, also from 2003. And again, that case states that where the summary plan description and the plan text differ, the participant is simply entitled to the better of the two. No requirement, as the district court asserted in this case, to show actual injury. And I note, as many cases have noted, that it would be an insurmountable burden to ask a participant to show actual injury in this situation. That would be asking someone to provide evidence of what he would have done in a situation that never occurred, that he got a proper disclosure. And that's insurmountable. How can somebody prove what he would have done by evidence in a situation that didn't arise? Turning a little bit from the contract theory, I want to mention the layout series of cases going on in the Second Circuit, because those are parallel and very close to what we're dealing with here. The standard in the Second Circuit as to requirement to show injury or not is reflected in the Burke decision. Let me quote a portion of that. This has subsequently been applied in the remand of the layout decision. The standard for defective summary plan description in Burke, the court said, we require for a showing of prejudice that a plan participant was likely to have been harmed as a result of a deficient SPD. Now, I want to point out several things about this. First, they're saying this is what they require for a showing of prejudice. So this is the evidence that they're saying is necessary. Second, they say that a plan participant had this effect. So they're not talking about the plaintiff in this case. They're talking about a reasonable man. And third, the effect was that he was likely to have been harmed, likely to have been harmed. That is not a statement that by preponderance of evidence, historical facts show that he was harmed. This is talking about a potential situation and what the likely effect is on a reasonable man, on a reasonable participant. Well, why are you treating the summary as the contract? Why isn't the actual plan the contract? Yeah, well, good question. First of all, because that's what the case law has said. Well, but we're looking at this thing where the summary disclaims if you've got a question, look at the contract. I don't know what these other plans said, but in this case, the summary tells the employee don't rely on it. Yes. Well, there's a lot of case law on that, or a fair amount of case law, at least. But we're looking at a contract. Don't look at somebody else's contract. Yeah. But the case law says that the primary source of information the participant has about his plan is the summary plan description. And he's been told, look at the contract. You've got a question. Yes. And the case law says that to put a note saying here's the primary source of information, here's what you have access to. Oh, but by the way, you have to go look someplace else. The case law says to do that really is ineffectual. It really undercuts the effect, the use of the summary plan description for the statutorily mandated purpose of being the primary source of information about the relationship. Do you claim that this is you claim for the whole period or was there a change in the information? OK. Good question. That's a very important question here, because Judge Byrne determined the district court determined that after 1995, the disclosures were improved and therefore an additional question comes up, which is what happens if you have a defective summary plan description? Which gives rise to a right, a cause of action. And then if that is corrected, as I understand Xerox's position, it's the day they got it corrected. The slate is wiped clean and any rights that have arisen are now forfeited. I think that provision makes no sense at all. If individuals have been coming to work under what amounts to a unilateral contract, if they were offered something, if they came to work because of that, they've accrued rights and those rights cannot be simply pulled out. That rug can't be pulled out from under them by by an 11th hour correction when they come in and say they want their benefits. So you're trying to claim it goes all the way through at least until they correct it. Yes. What about after they correct it? Well, after they correct it, if they make a clear correction, at least if the correction speaks to the effect of the transition between what they used to say and where it is now. Certainly if if they once they make a correction, then then then the participant is no longer coming to work expecting the benefits that were described in the prior document. So to the extent that a retirement account is after all, a retirement benefit is something that accrues year by year. Each year when you come to work, you accrue a benefit. And so something has accrued prior to the date of the correction, even though it's not yet payable. And that can't be taken away under a unilateral concept, concept, unilateral contract concept. Nor can it be taken away under ERISA because Section 204G of ERISA says that you cannot take away a benefit that is already accrued. Now, you get a little more complicated because Section 204H of ERISA says you also can't change the future rate of accrual without clearly notifying the participant. And how that applies in this context is perhaps a little bit more complicated. I have two seconds left. So thank you. May it please the Court. Good morning, Your Honors. Robert Perrin on behalf of Apelli's Xerox Corporation Xerox Retirement Income Guaranteed Plan and Patricia Naismith. I actually want to start out with the disclosure argument, at least a portion of it, since Counsel Opposite just finished with the point that he believes the 1995 SPD in some way cut back an established contractual benefit that had been established by the 1993 SPD. I would note as a preliminary matter that the Section 204G argument was not made to the District Court, was not made in any of the briefing below, nor argued at trial. It was, I believe, a footnote in their opening brief before this Court, and there was a page devoted to it in its reply brief. But really, that issue isn't before the Court today. The petitioners have not contested at any point, or argued rather, that the 1995 SPD in some way constituted an impermissible cut back in benefits that had been established in the 1993 SPD. So that argument is not before the Court today. In terms of the rest of the disclosure argument, I want to point out a couple of key facts. First of all, the 1993 SPD was circulated and the plaintiffs or appellants did receive it, but there's no evidence in this record that they read it or that they relied on it in any way. And in fact, they've conceded that they could not prove reliance in this case. They all did receive and have admitted that they've received the 1995 SPD that contained the adequate disclosure. Disclosure that they are not contesting was adequate for purposes of this appeal. They first requested a benefits calculation. For Miller, it was in July of 1997, two years after receiving adequate disclosure. For Suttoth, it was April of 1998. For Allen, it was October of 1997. They filed their lawsuits then in 1998 and 1999, so four or five years after receiving adequate disclosure, having never relied on or read the 93 SPD that they advanced today as the basis of their claims. To this day, Miller and Suttoth are still employed by Xerox. Allen retired, I believe, in late 1997 or early 1998. They now argue that they should be able to rely retrospectively on the 1993 SPD as the basis of their claims. And they say that the standard should be that they don't have to prove reliance and they don't have to prove prejudice. Okay. If you accept that the, as I've represented to you, that the section 204G argument, the cutback argument, is not before the court today, you have to look at what Xerox is entitled to do as a matter of law with respect to its ERISA plan. They are entitled to periodically or whenever they want, effectively, clarify, reissue a plan. They cannot cut back benefits when they do so. They cannot cut back vested benefits. That's clear under the law. But again, that argument isn't before the court today. What they are entitled to do is modify their disclosures, reissue a plan. Xerox has an absolute right to do so. And that's all that they did so here. The 1993 SPD, as the layout court found, didn't say plaintiffs are not entitled to, or plaintiffs are entitled not to have any offset taken for prior distributions from their, that they'd received from the plan. What the layout court said was the 93 SPD says you may take, there may be an offset, but it just didn't say enough. And that's what the district court found here as well. The 1995 SPD certainly went much further, satisfied what layout said would be appropriate, and went even further than that. Gave these appellants full disclosure of the fact that there would be an offset for the prior distributions they had received for the prior period of service at Xerox. I would point out with respect to the detrimental reliance and likely prejudice point, virtually every circuit that has looked at this issue of whether or not you can enforce a deficient SPD against a plan has concluded that there has to be some showing of reliance or prejudice. And, you know, I think we have a string cite in our brief, and I can recite those cases for you. Here are the number of circuits that have concluded reliance and or prejudice is necessary. It's notable, though, that in each of those cases, the circuits were addressing whether or not you could enforce a currently operating, the governing SPD as against the governing plan. They weren't even dealing with this circumstance where the appellants are seeking to enforce an ancient SPD, a 1993 SPD against the terms of the plan today and to use it to trump all subsequent disclosures by Xerox. And I think this court, separate and apart from whether this court reached the conclusion that a detrimental reliance standard or a likely prejudice standard was required to assert the benefits of a deficient SPD against a currently governing plan, that is a currently governing SPD against a current plan, this court could say that if you're going to try and enforce an old SPD, a no longer binding, a no longer operable SPD, you have to establish detrimental reliance. You have to establish you were at least aware of that SPD, of what its terms were, and that you were harmed in some way. And as Judge Byrne found in the district court, these plaintiffs couldn't meet that standard. Shifting back to the ERISA violations argument that my colleague, my learned colleague, began with, this case, when we look at the assertion that ERISA's imputation of interest to the prior distribution violates ERISA, I mean, I think the petitioners or the appellants have viewed this case in terms of the fact that there is a violation of ERISA. If I'm reading correctly from the beginning, this case is not about projections. It's not about an actuarial calculation that projects forward and discounts back. That's what the Berger case is about. This case is about taking the value, taking a prior distribution from the Xerox plan and valuing it for purposes of determining what the offset should be in the floor offset structure that was the Xerox and is the Xerox plan. Plaintiffs conceded at trial, and I believe appellants conceded today here at argument, that there should be an offset for their past distributions. That point is not in dispute. They also conceded at trial that there should be interest ascribed to those past distributions. Really, the bottom line here is a dispute over what interest rate is appropriate. Well, this is a bit different from that. Let's just take a straight defined benefit plan. Let's assume it's not a hybrid plan. So the employee works for 10 years, let's say earns what would be a defined benefit of $300 a month, something like that. Leaves the company or gets a lump sum distribution, leaves the company and comes back. Now, that's a pretty easy situation because you would deduct the $300 a month from whatever defined benefit the employee would accrue after that, right? That sounds correct, Your Honor. Now, but what you couldn't do under that scenario is to say, well, really something's changed, so we're going to deduct more than $350 or $400. Isn't the effect of a hybrid plan to divest the vested rights of the employees in their defined benefit plan? I mean, if they had accrued certain rights as of the time they left and the effect of the hybrid plan is to divest them of that rights, doesn't that violate ERISA? I would say no, Your Honor, because that's the way a floor offset plan always works. Yes, I understand that that's the way it works, but the net result, it seems to me, is to reduce the vested rights that they've acquired under the defined benefit plan. Well, in interpreting ERISA, the IRS in their regulations and also the courts that have looked at it have concluded that a floor offset arrangement doesn't violate ERISA. To conceptualize it in a different way, I mean, if you have an employee who has a defined contribution individual account and is receiving contributions from their employer into that account, and that's growing and developing into a bigger balance because interest is being added to those contributions, and at the same time they are accruing benefits under a formula benefit or a defined benefit component of the plan, it's certainly true that you have to offset that defined contribution or that individual account against that formula benefit. If you didn't, you would have effectively a plaintiff or rather a plan participant receiving two forms of pension benefits, double benefits. They would be receiving a formula benefit, and then on top of it, they would get their individual account. It's perfectly permissible under ERISA for an employer or a plan to take that individual account to fund the defined benefit portion of the plan, and that's what Xerox did here. With respect to the accrued benefit definition that counsel raised in his argument, I would note that he defined accrued benefit certainly accurately with respect to what an accrued benefit is in the context of a defined benefit plan, which is an annual benefit commencing at normal retirement age, but if you look at 29 U.S.C. section 1002.23, it also defines what an accrued benefit is in the context of an individual account plan, which is what we're setting off against the formula benefit, and that is the balance of the individual account, which includes both contributions and interest. So the accrued benefit definition that the appellants are relying on is not the only one that's germane to this case. Getting back to the Berger case, or rather to... Before you get back to it, would you just state clearly how you say they get $50,000 on their first retirement? How do you value that? Xerox took their prior distributions. I'm sorry, could you just say in your own words how do they value it? They value it as if it stayed in that account plan. Why should they do that? Because that's the fairest way to do it with respect to all participants. It treats every dollar in the plan exactly the same way. Well, why shouldn't it just be a straight whatever interest the Treasury would have paid or something like that? Because those dollars were pulled out of the profit-sharing plan accounts. They're out of it, and they're in somebody else's pocket. I don't see why Xerox or the plan gets the benefit of a hypothetical investment. It's not there. It's paid to the employee. And so now you're trying to figure out what it's worth to him. Well, let me use a couple examples that hopefully will explain why that is. I couldn't quite believe it. You're contending that Xerox imagines what it would have earned if it stayed in the fund. Is that right? They don't imagine it. They apply a direct calculation using the interest rate of the plan. What they're imagining is that money is no longer in the fund. It is no longer in the fund. It was taken away from the fund based on that it had been... It went to some particular person who then has to invest it in some way, and I would think he would get whatever the average interest is. These were Xerox dollars that had been contributed to this employee's individual accounts. And then given to the particular person. That's correct. So, I mean, it's so, I would say, so clear. I'm amazed you couldn't have settled this. But I'm telling you now that your argument is falling on at least one pair of somewhat deaf ears. Well, Your Honor, let me try and address your points by using a couple examples. Plaintiffs, as I said, have conceded that interest needs to be ascribed to this distribution. So, again, it's what interest rate is appropriate. How do we value these dollars at their present value now? These dollars that were taken from the profit-sharing account, how do we value them now for purposes of calculating an offset? The fairest way, the most accurate way to do that is to treat them as if they've been in the general fund. Let's say the Xerox general fund... That's unbelievable. Well, let me try my examples. That's not the fairest way. It's the way that would give the best result for the plan. Well, let me take another crack at that, though, Your Honor. Let's say the plan had performed poorly over the 1980s and 90s, that it had actually experienced a negative growth rate, that it had declined in its asset value. So their distribution was worth less at the time that they were taking the offset. Do you think that they would have sued? I don't think so. How would Xerox want to do it that way? Xerox is doing it this way because they're trying to figure out what is the best way to value these dollars at their most direct value, to ascribe the most precise present value that they can. And treating them when they were pulled from the plan as if they'd remained in the plan gives you that precise calculation. But you have to admit that's imaginary, since they didn't remain in the plan. The dollars were drawn from the plan and no longer in the plan, that's true, but any interest that you ascribe to them would be imaginary in that sense, Your Honor. No, we know what the average is. That's not imaginary. The average meaning? The treasury rate or whatever you want to take as a standard of interest. I understand that, but I also understand that the Xerox general fund return rate isn't imaginary either. It's concrete, and I can, well, if I knew it off the top of my head, I could recite to you what it was for every year in that intermediate period. At least to one member of this Court, that seems to me the issue, not what some other Court decides in some other context. I appreciate that, Your Honor. I just would point out that in any number of other scenarios, if you look at it in terms of trying to come up with a precise value for those dollars, this really was, it's a lawful way under ERISA, and that's really the question before the Court, whether or not individually it works out in an equitable way, and I guess that would be the point that I would really want to make. But what does the employee do now? The employee left Xerox, got a lump sum of money, and a number of years go by and goes back to work at ERISA, right? Goes back to work, yes. Not ERISA, Xerox. Xerox, yes. And so the employee wants to get back in the plan, right? Presumably, yes. Presumably. So to get back in the plan, the employee has to give back the amount that was withdrawn plus what that sum of money would have earned had it remained in the plan, what his value of interest would be had he remained in the plan. And there was just $50,000 in there. Well, there's two ways to approach that, Your Honor, in terms of incorporating an employee, a returning employee into a plan. There is that buyback approach that you just outlined, but it's not a mandatory approach, and Xerox took the alternative approach. Is that what most plans, well, two retirement plans that I've had any contact with, require such a payment with that computation? That's certainly a permissible way to do it, Your Honor. But in this, Xerox's way was equally lawful, which was to not allow them to buy back into the plan, but to credit them with all their years of service for purposes of determining their formula benefit and then take an offset for their prior distribution. That's an alternative approach, which is the one they adopted here. And which is best for the employee? It would depend on the circumstances, I believe, in any given situation. It would be hard to say. I don't think you could make any generalization across the board. Why would Xerox choose one method over another? I don't know the rationale behind their original selection, but, I mean, you can envision a scenario where someone buys back into a plan that three years later goes into default. I mean, there's any number of scenarios where buyback might not be a good alternative for the employee if they're buying back into a plan that's not doing well, for example. Well, when the plan is set up, Xerox has its actuaries, right? Presumably, yes, Your Honor. They're right there. They help them draft the agreement. And so they're going to try to figure out a plan. They're looking into the future method that's going to be best for Xerox. That's what they do. Best for Xerox employees, actually, I believe, Your Honor, is what they were thinking about. Best for Xerox. I mean, Xerox doesn't have to have a retirement pension fund at all. No. They're part of a compensation package. That's true. Well, I'm glad I don't have to worry about those things personally. I would make one last point with respect to the arguments that Judge Noonan raised, that if you think about it, if their dollars had remained in the plan, if you take John Doe with the same distribution or the same account balance that Miller had when he received his distribution, that amount is worth a specified value based on the performance of the plan. And we would submit that that's the fairest way to calculate the offset of the dollars taken away from the plan by the appellants when they left Xerox from the first day. And I think your best argument is it's not illegal anyway. That's our lead, Your Honor. Thank you very much.
judges: Pregerson, Noonan,thomas